BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

KELLY GUZZO PLC
Kristi C. Kelly (*pro hac vice forthcoming*)
Casey S. Nash (*pro hac vice forthcoming*)
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
Tel: 703/424-7570
kkelly@kellyguzzo.com
casey@kellyguzzo.com

*Attorneys for Plaintiff*
*(additional counsel listed on signature page)*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

GRACIELA TELLO, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING,

Defendant.

Case No. '26CV3597 AJB JAC

**CLASS ACTION COMPLAINT FOR:**

**(1) Breach of Contract;**

**(2) Fair Debt Collection Practices Act, 15 U.S.C. § 1692f;**

**(3) Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17; and**

**(4) Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;**

**JURY TRIAL DEMANDED**

Plaintiff Graciela Tello, on behalf of herself and the classes set forth below, files this Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and alleges as follows:

## PRELIMINARY STATEMENT

1. This case is about Shellpoint's failure to honor the explicit terms of Plaintiff's and the putative class members' loan modification agreements.

2. In September 2022, Plaintiff and Shellpoint's predecessor in interest, Specialized Loan Servicing, LLC ("SLS") entered into a Loan Modification Agreement for Plaintiff's home equity line of credit ("HELOC").

3. The parties agreed that Plaintiff would make monthly payments of $464.09 per month beginning on October 20, 2022.

4. The parties further agreed that Plaintiff's interest rate would be "calculated at 5.500% for 36 months" during a "Temporary Interest Rate Adjustment Period," after which Plaintiff's "interest rate [would] revert to the rate applicable pursuant to the terms of [her] note and/or any previously agreed upon terms."

5. But after Shellpoint's parent company, Rithm Capital, acquired SLS, Shellpoint began charging Plaintiff interest rates that exceeded 5.5%—still during the Temporary Interest Rate Adjustment Period.

6. For example, in August and September 2024, Plaintiff was charged an 8.5% interest rate.

7. Later, in May 2025, Shellpoint charged Plaintiff 8.0% interest.

8. Upon information and belief, either intentionally or due to a systematic failure to board the modification properly as part of the acquisition, Shellpoint neglected to honor Plaintiff's loan modification.

9. Upon information and belief, other borrowers who modified their HELOCs with SLS suffered the same fate.

10. Borrowers like Plaintiff, therefore, were assessed interest that they were not obligated to pay.

11. Plaintiff and other borrowers then paid amounts not owed under their respective loan modification agreements.

12. Eventually, beginning in or around early 2026, Shellpoint breached Plaintiff's Loan Modification Agreement again by changing her minimum monthly payment from $464.09 (the amount agreed to in the Loan Modification Agreement) to amounts that exceeded $1,200 per month.

13. Upon information and belief, other borrowers were similarly assessed monthly payment amounts that exceeded the amounts agreed to in their respective loan modification agreements.

14. Plaintiff and other borrowers then made monthly payments not owed under their respective loan modification agreements.

15. Shellpoint's conduct not only breached the parties' respective contracts but violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Rosenthal Debt Collection Practices Act ("Rosenthal Act"), Cal. Civil Code § 1788, *et seq.*; and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

16. Plaintiff asserts those claims on behalf of a class of similarly situated consumers who, like Plaintiff: (i) were charged interest in contravention of their loan modification agreements; and (ii) were assessed monthly payment amounts in excess of the amounts agreed to in their loan modification agreements.

17. Apart from her class claims, Plaintiff individually sues Shellpoint for its unfair conduct in servicing her HELOC.

18. Following a period of financial hardship, Plaintiff's HELOC was discharged in bankruptcy and charged off in August 2014.

19. Following the charge-off, no one contacted Plaintiff regarding her HELOC, sent her monthly statements, or otherwise informed her that interest was still accruing on the loan.

20. Statements, of course, would have periodically apprised Plaintiff of the balance of her loan, including interest that was supposedly still accruing after discharge and charge-off of the loan. Statements were especially critical because Plaintiff was at risk of losing her home through foreclosure.

21. Plaintiff did not hear anything regarding her HELOC until 2022, when after years of silence, SLS resurfaced and demanded that Plaintiff pay almost $75,000 to reinstate her loan or face foreclosure.

22. It was at that time, and in face of that pressure, when Plaintiff agreed to the Loan Modification Agreement that Shellpoint ultimately did not honor.

23. The damage, of course, had already been done. SLS now stands to collect significantly more money from Plaintiff because of the interest charges that accumulated when she was not sent monthly mortgage statements.

24. On that basis, Plaintiff asserts individual claims against Shellpoint for violations of the UCL.

## PARTIES

25. Plaintiff Graciela Telo is a resident of Chula Vista, California.

26. Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware. Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024. Defendant Newrez, LLC d/b/a Shellpoint is referred to herein as Shellpoint and/or SLS interchangeably for the purposes of liability.

27. Defendant Shellpoint is a debt collector under the FDCPA, 15 U.S.C. § 1692a(6), because its predecessor-in-interest, SLS, treated Plaintiff's loan as in default at the time that it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003).

## JURISDICTION AND VENUE

28. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k. It also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

29. This Court has personal jurisdiction over Shellpoint. Shellpoint conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

30. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## FACTS

31. Plaintiff purchased her home in Chula Vista, California in April 2005.

32. As was common at that time, Plaintiff financed the purchase using an 80/20 mortgage, with her second mortgage being a HELOC with a balance of $149,900.

33. Her HELOC specifically stated that: "At a minimum, you [her lender] will send me a periodic statement monthly."

34. In or around August 2014, Plaintiff's HELOC was discharged and charged off following a Chapter 7 bankruptcy.

35. Following the bankruptcy, Plaintiff did not receive any monthly statements or other communications regarding her HELOC.

36. As a result, Plaintiff was not apprised of the balance of her loan, including that interest was supposedly still accruing after discharge and charge-off of the loan.

37. The CFPB criticized the practice of withholding monthly statements on long-dormant mortgages for periods in which they failed to provide monthly

statements to consumers and acknowledged the impact that the practice has on consumers:[1]

> Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. … One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. … [In the event of default,] the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. … Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay.

38. At some point after her bankruptcy, Plaintiff's HELOC was transferred to SLS for servicing.

39. Plaintiff was not notified of the servicing transfer.

40. Because she was not sent monthly statements or other communications regarding the loan, Plaintiff did not realize that interest was still accruing on her HELOC until 2022, when she received letters (but not monthly statements) threatening foreclosure if she did not pay approximately $75,000 to bring her loan current.

---

[1] https://www.federalregister.gov/documents/2023/05/01/2023-09171/fair-debt-collection-practices-act-regulation-f-time-barred-debt (last visited June 3, 2026).

41. After receiving these letters, Plaintiff contacted SLS and learned that the balance of her loan was more than $195,000—more than $45,000 higher than her original balance.

42. Plaintiff could not afford to pay a lump sum of almost $75,000 to reinstate her loan and she did not understand how the balance of her loan could have ballooned without anyone contacting her for almost a decade.

43. Plaintiff, however, did not want to lose her home, where she had lived for almost two decades.

44. Thus, in response to those letters and in fear of losing her home, Plaintiff and SLS entered into a Loan Modification Agreement in September 2022.

45. The Loan Modification Agreement was signed by SLS. A copy of the Loan Modification Agreement is attached as **Exhibit A**.

46. Plaintiff made the required down payment on $22,490.05.

47. Plaintiff and SLS also agreed that Plaintiff would make monthly payments of $464.09 per month beginning on October 20, 2022.

2. Payments:

- Beginning on 08/26/2022, the scheduled minimum monthly payment will include repayment of the interest-bearing portion of the Principal Balance, in accordance with the amortization term referenced in Section 4 below. Borrower promises to make monthly payments of principal and interest of U.S. $464.09* beginning on 10/20/2022, and continuing thereafter on the same day of each succeeding month.

48. Plaintiff and SLS further agreed that Plaintiff's interest rate would be "calculated at 5.500% for 36 months" during a "Temporary Interest Rate Adjustment Period":

3. Interest Rate Calculation:

- If your interest rate prior to this agreement was variable or subject to interest rate adjustments (Adjustable Rate Mortgage) this agreement notifies you that your Interest Rate will be temporarily calculated at 5.500% for 36 months known as the "Temporary Interest Rate Adjustment Period". Upon the expiration of the "Temporary Interest Rate Adjustment Period" and continuing thereafter until 10/14/2035 (the "Maturity Date"), the interest rate will revert to the rate applicable pursuant to the terms of your note and/or any previously agreed upon terms.

49. Beginning in October 2022, SLS adhered to the terms of the Loan Modification Agreement.

50. For several months, Plaintiff's HELOC was assessed a 5.5% interest rate as agreed in the Loan Modification Agreement, and Plaintiff was required to make monthly payments of $464.09.

51. But not long after Rithm Capital acquired SLS, Shellpoint began assessing interest rates that exceeded 5.5%.

52. This was so even though the HELOC remained in the Temporary Interest Rate Adjustment Period established by the Loan Modification Agreement.

53. Upon information and belief, either intentionally or due to a system issue in the way loan modification agreements were boarded, Shellpoint enforced HELOCs like Plaintiff's without considering whether those loans or lines of credit had been modified.

54. In August and September 2024, Plaintiff was charged an 8.5% interest rate.

55. Plaintiff's August 2024 statement reflected the following:

**PLAN BALANCES AND FINANCE CHARGES FROM 07/26/2024**

| APR | Average Daily Principal Balance | Daily Periodic Rate | Periodic Finance Char | Number of Days In Billing Cycle |
|---|---|---|---|---|
| 8.50000% | $88,728.02 | 0.02329% | $638.84 | 31 |

56. As another example, Plaintiff was charged an 8.0% interest rate for part of May 2025, as shown in her statement dated June 26, 2025:

**PLAN BALANCES AND FINANCE CHARGES FROM 05/27/2025 TO 06/26/2025**

| Rate Date | APR | Average Daily Principal Balance | Daily Periodic Rate | Periodic Finance Charge | Number of Days in Billing Cycle * |
|---|---|---|---|---|---|
| 05/27/2025 | 8.00000% | $88,425.97 | 0.02191781% | $19.38 | 1 |
| 05/28/2025 | 5.50000% | $88,415.63 | 0.01506849% | $386.28 | 29 |

57. During these periods, Plaintiff made monthly payments, inclusive of amounts accrued as a result of the incorrect interest charges.

58. Due to Shellpoint's failure to honor the Loan Modification Agreement, Plaintiff incurred interest that should not have accrued per the operative agreement.

59. Then, in early 2026, Shellpoint breached the Loan Modification Agreement again by changing Plaintiff's minimum monthly payment from $464.09 (the amount agreed to in the Loan Modification Agreement) to amounts that exceeded

$1,200 per month, despite the clear language in the Loan Modification Agreement that stated her payment would be $464.09.

| Description | Amount | Principal | Interest | Escrow |
|---|---|---|---|---|
| Payment Due 03/20/2026 | $1,208.08 | $752.24 | $455.84 | $0.00 |
| Payment Due 02/20/2026 | $1,269.14 | $745.86 | $523.28 | $0.00 |
| Payment Due 01/20/2026 | $464.09 | $0.00 | $464.09 | $0.00 |
| NSF Fee Balance | $15.00 | | | |
| | $2,956.31 | | | |

60. As to Plaintiff and a class of similarly situated individuals, Shellpoint breached its contracts modifying HELOCs.

61. Shellpoint's conduct also violated the FDCPA, the Rosenthal Act, and California's UCL.

62. As a result of Shellpoint's conduct relating to its failure to honor the Loan Modification Agreement, Plaintiff has suffered, and continues to suffer, financial and emotional harm, including, but not limited to, the amounts overpaid to Shellpoint, a reduction in her present and future home equity and emotional distress caused by the inflated claims of her outstanding debt.

63. Plaintiff has also suffered financial and emotional harm, including, but not limited to, a reduction in her present and future home equity and emotional distress caused by Shellpoint's unfair servicing practices, which violate the UCL.

## CLASS ACTION ALLEGATIONS

64. Plaintiff brings her claims on behalf of herself individually and, under Federal Rule of Civil Procedure 23(b)(3), on behalf of the following classes:

**Breach of Loan Modification Agreement (Interest Rate) Class**

> All consumers who are or were obligors with respect to a loan modification agreement with SLS, that provided for a flat interest rate for a definite period, which Shellpoint did not honor during the four-year period predating the filing of this lawsuit and continuing through the date of certification.

///

///

**Breach of Loan Modification Agreement (Monthly Payment Amount) Class**

All consumers who are or were obligors with respect to a loan modification agreement with SLS, that provided for a monthly payment amount, which Shellpoint did not honor during the four-year period predating the filing of this lawsuit and continuing through the date of certification.

**FDCPA Class**

All consumers (i) who had a loan that was in default at the time that SLS became servicer of the loan; (ii) who are or were obligors with respect to a loan modification agreement with SLS that provided for a flat interest rate for a definite period, which Shellpoint did not honor, or that provided for a monthly payment amount, which Shellpoint did not honor; and (iii) from whom Shellpoint or its agents collected payments from consumers not owed per the loan modification agreement, either because improper interest was included as part of the payment required or because the monthly payment required exceeded the amount due under the loan modification agreement.

**Rosenthal Act Class**

All California consumers (i) who are or were obligors with respect to a loan modification agreement with SLS that provided for a flat interest rate for a definite period, which Shellpoint did not honor, or that provided for a monthly payment amount, which Shellpoint did not honor; and (ii) against whom Shellpoint or its agents have collected or attempted to collect amounts not owed per the loan modification agreement, either because improper interest was included as part of the payment required or because the monthly payment required exceeded the amount due under the loan modification agreement, in the one-year period predating the filing of this lawsuit and continuing through the date of certification.

**UCL Class**

All California consumers (i) who are or were obligors with respect to a loan modification agreement with SLS that provided for a flat interest rate for a definite period, which Shellpoint did not honor, or that provided for a monthly payment amount, which Shellpoint did not honor; (ii) to whom Shellpoint or its agents, during the four-year period prior to the filing of this Complaint, sent written correspondence that included interest assessed pursuant to an inapplicable interest rate or sought

payment not due under the terms of the loan modification agreement; and (iii) the consumer paid that amount.

65. Plaintiff is a member and representative of all the Classes.

66. The Classes satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

67. **Numerosity:** The Classes are so numerous that joinder of all class members is impracticable. Given the volume of Shellpoint's business, there exist hundreds or thousands of class members.

68. **Commonality:** This case presents common questions of law and fact, including but not limited to:

a. Whether Shellpoint breached Plaintiff's and the putative class members' loan agreements by assessing interest at rates not permitted by loan modification agreements;

b. Whether Shellpoint breached Plaintiff's and the putative class members' loan agreements by requiring monthly payments in amounts not permitted by loan modification agreements;

c. Whether Shellpoint violated the FDCPA and the Rosenthal Act by attempting to collect amounts not authorized by loan modification agreements;

d. Whether Shellpoint's conduct was unlawful, unfair, or fraudulent under the UCL;

e. The proper scope of injunctive relief; and

f. The proper measure of damages.

69. **Typicality:** Plaintiff's claims are typical of the members of the Classes. The breach of Loan Modification Agreement, FDCPA, Rosenthal Act, and UCL violations suffered by Plaintiff are typical of those suffered by other class members,

and Shellpoint treated Plaintiff consistently with other class members, in accordance with their standard policies and practices. Discovery will show that Shellpoint used automated processes to assess interest and monthly payment amounts and that Shellpoint maintains electronic records showing the payments that it assessed and collected, inclusive of interest, including records of the dates on which payments were made.

70. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Classes because she and her experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

71. **Predominance & Superiority:** Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Shellpoint's conduct, as described in this Complaint, stems from common and uniform policies and practices, and it has resulted in common breaches of Loan Modification Agreements, as well as violations of the FDCPA, the Rosenthal Act, and the UCL. Members of the Classes do not have an interest in pursuing separate actions against Shellpoint, as the value of each class member's individual claim is small compared to the substantial expense, burden, and uncertainty of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments concerning Shellpoint's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

72. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## COUNT I

**Breach of Contract**

**(*On Behalf of the Breach of Loan Modification Agreement (Interest Rate) Class*)**

73. Plaintiff incorporates the preceding allegations.

74. Plaintiff and the Breach of Loan Modification Agreement (Interest Rate) Class Members modified their respective HELOCs by written agreements that included non-variable interest rates.

75. Shellpoint breached the terms of Plaintiff's and the Breach of Loan Modification Agreement (Interest Rate) Class Members' loan modifications when it assessed different rates to Plaintiff's and the Breach of Loan Modification Agreement (Interest Rate) Class Members' HELOCs.

76. Plaintiff and the Breach of Loan Modification Agreement (Interest Rate) Class Members have suffered harm because of Shellpoint's breaches, including, but not limited to, the risk of foreclosure of their homes, reduced financial capacity, and loss of equity, and, for some putative class members, the payment of the improperly assessed principal, interest, and fees.

77. Because of Shellpoint's breaches, Plaintiff requests that the Court award her and the Breach of Loan Modification Agreement (Interest Rate) Class Members actual damages and enjoin the collection of any principal, interest and fees for periods in which Shellpoint assessed inapplicable interest rates.

## COUNT II

**Breach of Contract**

**(*On Behalf of the Breach of Loan Modification Agreement (Monthly Payment Amount) Class*)**

78. Plaintiff incorporates the preceding allegations.

79. Plaintiff and the Breach of Loan Modification Agreement (Monthly Payment Amount) Class Members modified their respective HELOCs by written agreements that included monthly payment amounts.

80. Shellpoint breached the terms of Plaintiff's and the Breach of Loan Modification Agreement Class Members' loan modifications when it assessed different monthly payment amounts on Plaintiff's and the Breach of Loan Modification Agreement (Monthly Payment Amount) Class Members' HELOCs.

81. Plaintiff and the Breach of Loan Modification Agreement (Monthly Payment Amount) Class Members have suffered harm because of Shellpoint's breaches, including, but not limited to, the risk of foreclosure of their homes, reduced financial capacity, and loss of equity, and, for some putative class members, the payment of the improperly assessed principal, interest, and fees.

82. Because of Shellpoint's breaches, Plaintiff requests that the Court award her and the Breach of Loan Modification Agreement (Monthly Payment Amount) Class Members actual damages and enjoin the collection of any principal, interest and fees for periods in which Shellpoint assessed inapplicable monthly payment amounts.

**COUNT III**

**Fair Debt Collection Practice Act ("FDCPA")**

**15 U.S.C. § 1692f**

**(*On Behalf of the FDCPA Class*)**

83. Plaintiff incorporates the preceding allegations.

84. The FDCPA outlaws, among other conduct, collecting any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. 15 U.S.C. § 1692f(1).

85. Shellpoint violated this provision with respect to Plaintiff and the members of the FDCPA Class when it collected interest charges that exceeded the interest rate authorized by their loan modification agreements.

86. Shellpoint separately violated this provision with respect to Plaintiff and the members of the FDCPA Class when it collected monthly payments in amounts that exceeded the amount required by their loan modification agreements.

87. Plaintiff and each member of the FDCPA Class suffered a concrete injury-in-fact when they paid improper interest to Shellpoint.

88. In addition, members of the FDCPA Class suffered actual damages by a reduction in home equity; emotional distress, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

89. Under 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for herself and for each member of the FDCPA Class, plus reasonable attorneys' fees and costs.

## COUNT IV

### Rosenthal Fair Debt Collection Practices Act

### Cal. Civ. Code § 1788.17

**(*On Behalf of the Rosenthal Act Class*)**

90. Plaintiff incorporates the preceding allegations.

91. Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692f and 1692k.

92. Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the FDCPA provisions incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692f, and 1692k. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

93. Shellpoint therefore violated Section 1788.17 of the Rosenthal Act with respect to Plaintiff and the members of the Rosenthal Act Class when it collected amounts that were not permitted by the loan modification agreements.

94. Plaintiff and each member of the Rosenthal Act Class suffered a concrete injury-in-fact when they paid improper interest to Shellpoint.

95. In addition, members of the Rosenthal Act Class suffered actual damages by a reduction in home equity; emotional distress, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

96. Under 15 U.S.C. § 1692k, as incorporated by § 1788.17 of the Rosenthal Act, Plaintiff seeks actual and statutory damages for themselves and for each member of the Rosenthal Act Class, plus their reasonable attorneys' fees and costs. She also seeks actual damages for members of the Rosenthal Act Class members who paid improper interest or fees to Shellpoint, in the amount of any such interest or fees.

## COUNT V

### California Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### *(On Behalf of the UCL Class)*

97. Plaintiff incorporates the preceding allegations.

98. California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

99. By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 980 (2018).

100. The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws." Cal. Bus. & Prof. Code § 17205.

101. An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct.

102. Here, Shellpoint's practices were "unlawful" under the UCL because, as alleged above, they violated the FDCPA and the Rosenthal Act and breached the parties' contract.

103. Shellpoint's practices were also "unfair" under the UCL because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to assess improper interest rates and monthly payment amounts that were not allowed under the operative contract and collect or attempt to collect the same.

104. The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

105. Plaintiff and members of the UCL Class suffered injuries in fact and have lost money or property because of Shellpoint's practices when they paid the improper interest charges or monthly payment amounts or lost equity in their home because of the improper charges.

106. Because, to this day, Shellpoint persists in its efforts to collect improper interest, there is a real and immediate threat that Plaintiff and members of the UCL Class will suffer these same injuries again.

107. Plaintiff and members of the UCL Class are therefore entitled to injunctive relief to correct the balances on their HELOCs; actual damages in the amount of any inaccurate interest paid by the class members; and the recovery of their reasonable attorneys' fees and costs.

## COUNT VI

### California Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

***(Individual Claim)***

108. Plaintiff incorporates the preceding allegations.

109. California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

110. By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal.5th 966, 980 (2018).

111. The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws." Cal. Bus. & Prof. Code § 17205.

112. An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct.

113. Here, Shellpoint's practices were "unfair" under the UCL. A practice is unfair if has an impact on its alleged victim that outweighs the reasons, justifications, and motives of the alleged wrongdoer.

114. Here, Shellpoint failed to contact Plaintiff regarding her Loan and then began actively foreclosing on the property, without prior notice that the Loan was accruing interest.

115. Shellpoint's policy of long-term abandonment of contact with Plaintiff—even though her HELOC agreement required it to send her monthly statements—and then subsequently demanding a lump sum amount that vastly exceeded Plaintiff's original loan balance due to interest, fees, and costs that have allegedly accrued during those years of silence under threat of loss of her home is unfair.

116. For example, Plaintiff missed opportunities to forestall the accrual of interest and fees through loss mitigation, refinancing when the balance and interest rates were lower, and other available options.

117. As discussed above, the CFPB has expressed concern about this very practice and the unfair impact on consumers unexpectedly facing foreclosure.

118. The Consumer Financial Protection Bureau ("CFPB") has also stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to the consumer."[2] Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[3]

119. Plaintiff asserts that Shellpoint cannot articulate how this practice benefitted Plaintiff. Rather, Shellpoint is taking advantage of the years that Plaintiff expended building equity in her home, for Shellpoint's own financial gain.

120. These allegations are sufficient to demonstrate a claim under the UCL's unfair prong. *Naranjo v. Bank of Am., N.A.*, No. EDCV23546DMGASX, 2023 WL 8885144, at *7 (C.D. Cal. Nov. 17, 2023); *Garcia v. First Franklin*, No. 2:25-CV-07063-SVW, 2025 WL 2631533, at *3 (C.D. Cal. Aug. 4, 2025); *Warren v. Specialized Loan Servicing LLC*, No. 5:23-cv-00887, 2024 WL 3207003, at *3 (C.D. Cal. Mar. 1, 2024); *Gonzalez v. Specialized Loan Servicing LLC*, 691 F. Supp. 3d 1162, 1177 (C.D. Cal. 2023).

121. The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

122. Plaintiff suffered injuries in fact and has lost money or property because of Shellpoint's practices. For example, she has paid money towards the improper interest charges and has also lost significant equity in her home.

123. Because, to this day, Shellpoint persists in its efforts to collect these illegitimate fees and interest, there is a real and immediate threat that will suffer these same injuries again.

---

[2] 12 C.F.R. Part 1026 (CFPB Official Interpretations), https://files.consumerfinance.gov/f/ 201301_cfpb_final-rule_servicing-tila.pdf (last visited Oct. 2, 2024).

[3] *Id.*

124. Plaintiff therefore is entitled to injunctive relief to correct the balance on her HELOC; disgorgement of sums wrongfully obtained, actual damages in the amount of any illegal fees or charges paid; and the recovery of her reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Classes, seeks the following relief:

A. Determining that this action may proceed as a class action under Federal Rule of Civil Procedure 23;

B. Designating Plaintiff as the class representative for the Classes;

C. Designating Plaintiff's Counsel as counsel for the Classes;

D. Issuing proper notice to the Classes at Shellpoint's expense;

E. Declaring that Shellpoint committed multiple, separate violations of the FDCPA, the Rosenthal Act, and the UCL and breached the loan modification agreements;

F. Declaring that amounts claimed by Shellpoint are not owed;

G. Awarding actual and statutory damages as provided by the FDCPA, the Rosenthal Act, and the UCL and for breach of contract;

H. Granting appropriate injunctive relief, including restitution and disgorgement, as provided by the UCL and for the breach of contract;

I. Awarding reasonable attorneys' fees and costs and expenses; and

J. Granting other relief, in law or equity, as this Court may deem appropriate and just.

///

///

///

///

///

**JURY DEMAND**

Plaintiff, on behalf of herself and the Classes, demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

Dated: June 17, 2026

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)

By: *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

KELLY GUZZO PLC
Kristi C. Kelly (*pro hac vice forthcoming*)
Casey S. Nash (*pro hac vice forthcoming*)
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
Tel: 703/424-7570
kkelly@kellyguzzo.com
casey@kellyguzzo.com

LANGER, GROGAN & DIVER, PC
Irv Ackelsberg (*phv forthcoming*)
David Nagdeman (*phv forthcoming*)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215/320-5660
iackelsberg@langergrogan.com
dnagdeman@langergrogan.com

*Attorneys for Plaintiff*